NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH VEGA, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO. 06-5841 (JAP) |
| CIGNA GROUP INSURANCE and EXXON MOBIL INC., | : |
| | : **OPINION** |
| Defendants. | : |

APPEARANCES:

Gregg M. Hobbie
Law Office of Gregg M. Hobbie
One Main Street, Suite 311
Eatontown, New Jersey 07102
    *Attorney for Plaintiff*

Joseph T. Walsh, III
Rosemarie DaSilva
McCusker, Anselmi, Rosen, Carvelli & Walsh, P.C.
127 Main Street
Chatham, New Jersey 07928
    *Attorneys for Defendant*s

PISANO, District Judge.

This action arises from a Complaint brought pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, ("ERISA"), seeking to recover benefits under the terms of an Employee Welfare Benefit Plan. Currently before the Court is a motion for summary judgment brought by Defendants ExxonMobil Disability Plan ("the Disability Plan" or "the Plan") and Connecticut General Life Insurance Company ("CGLI") (collectively,

"Defendants"). Plaintiff Joseph Vega ("Vega") opposes the motion and cross-moves for summary judgment to be entered in his favor. The Court has jurisdiction over this dispute pursuant to 29 U.S.C. § 1132(e) and, having considered the documents submitted in support of the motions and having heard oral argument, grants Defendants' motion for summary judgment and denies Vega's cross-motion for summary judgment.

**I.     BACKGROUND**

    **A.     The Disability Plan**

As a former employee of ExxonMobil Corporation ("ExxonMobil"), Vega is covered by ExxonMobil's Disability Plan, an "Employee Welfare Benefit Plan" under ERISA. Under the Disability Plan, a covered employee could receive long-term disability benefits if he: (1) has had at least one year of benefit service; (2) have become "incapacitated[;]"[1] (3) is no longer receiving short-term disability benefits; (4) stopped his employment due to his disability; (5) obtains proper

---

[1] The Plan defines "incapacitated" as:
  Unable to perform work according to these standards:
    * During the employee's initial period of disability . . . , the person is incapacitated if:
      * The person is wholly and continuously unable – by reason of a physical or mental health impairment – to perform any work suitable to the persons' capabilities, training and experience, that the person's employer has available, and
      * Such inability to perform work is reasonably expected to last at least six months from the date the person's ability to perform work is determined.
    * After the initial period, a person is incapacitated if the person is wholly and continuously unable, by reason of a physical or mental health impairment, to perform any work for compensation or profit for which the person is or may become reasonably fitted by education, training or experience. The determination of whether a person is incapacitated will be reviewed periodically.

(Defs' Br., Ex. D at 31).

medical care and follows treatment; (6) provides the claims administrator, upon demand, a certificate from his treating physician; (7) submits to medical examinations as required; (8) keeps the claims administrator advised of his location; and (9) "[t]ake[s] any other steps as required[.]" (Defs' Br. Ex. D at 12). However, after an "initial period of disability"—defined as "[t]he two-year period measured from the last day the person was actively at work for the company[,]" (Defs' Br. Ex. D at 31)—long-term disability benefits "continue only if the [Benefits Continuation Test] determines that [the covered employee] is incapacitated." (Defs' Br. Ex. D at 15).

To administer this Plan, ExxonMobil contracted with CGLI under a Service Agreement ("Agreement"), effective as of January 1, 2002. (Defs' Br., Ex. E). As part of the Agreement with ExxonMobil, CGLI was to make the determinations of eligibility, and continuing eligibility, for benefits sought by covered ExxonMobil employees. (Defs' Br., Ex. E at 21). Exhibit B to that Agreement provided the scope of services to be rendered by CGLI and, in section VI, required CGLI to "perform a Benefits Continuation Test (BCT), internally referred to by [CGLI] as the 'any occupation' test, on all individuals separated from ExxonMobil service due to inability to perform ExxonMobil work." (Defs' Br., Ex. E at 24). According to this section, "[t]he purpose of the BCT is to determine whether the individual is capable of performing productive employment in either the same capacity as or a different capacity from that which the person performed while employed at ExxonMobil." (Defs' Br., Ex. E at 24).

The Agreement then sets forth, in the same section, the various documents CGLI is to review to make its determination and the time line in which CGLI must make a determination on a claim for benefits. (Defs' Br., Ex. E at 24-27). Specifically, it also states that, in the event an,

> attending physician's statement states directly or indirectly that the claimant is incapacitated as defined in the Plan, but fails to provide sufficient medical/clinical documentation to support the conclusions, [CGLI] will obtain a second medical opinion the cost of which will be borne by the Plan upon receipt of [CGLI's] monthly invoice with supporting documentation. This could include, but is not limited[] to[,] performance of an Independent Medical Examination (IME), referral to a medical consultant, a medical peer review or an Independent Functional Capacity Evaluation (FCE).

(Defs' Br., Ex. E at 26). If the BCT determines that a claimant is able to perform his former job at ExxonMobil or engage in productive employment with *any* other employer, then his long-term disability benefits will end. (Defs' Br., Ex D at 15).

However, a claimant who is denied long-term disability benefits may appeal CGLI's denial. (Defs' Br., Ex. D at 25). At the first appeal level, a claimant appeals directly to CGLI in a "written appeal[.]" (Defs' Br., Ex. D at 25). If the claim for benefits is again denied by CGLI, then a claimant may bring an action against the Plan under section 502(a) of ERISA or "submit a voluntary appeal to the Administrator [of] Benefits." (Defs' Br., Ex. D at 25-26). If the Administrator also denies benefits, the claimant may then bring an action against the Plan under ERISA. (Defs' Br., Ex. D at 26).

### B.    The Denial of Vega's Long-Term Benefits

From March 27, 1990 to May 27, 2004, ExxonMobil employed Vega as a "DOT Covered Commercial Truck Driver." (Defs' Br., Ex. A at 3, 6). At some point Vega became depressed and, as a result, could no longer perform the functions required of a truck driver. Accordingly, from May 28, 2004 through November 17, 2004, Vega received short-term disability benefits through the Disability Plan. (Defs' Br., Ex. A at 3). This was followed by an initial grant of long-term benefits, approved of by CGLI on January 4, 2005. (Defs' Br., Ex. A at 3, Ex. F).

Near the end of his "initial period of disability[,]" on December 12, 2005, CGLI sent Vega a letter, stating that it would be conducting the "any occupation" test to determine whether he continues to be eligible for long-term benefits under the Plan. (Defs' Br., Ex. G). That letter specifically requested that Vega complete and return a Disability Questionnaire with Disclosure Authorization and a Disability Claim Statement. (Defs' Br., Ex. G).

Vega complied with CGLI's letter, submitting a Disclosure Authorization Form and a Disability Claim Statement, indicating that he suffered from depression and was being treated by a psychiatrist, Louis Abenante, M.D., and a family practitioner, Roger Thompson, M.D. (Defs' Br., Ex. H & I). In response to a request from CGLI, Dr. Thompson, on May 16, 2006, informed CGLI that he did not treat Vega "for any disabling condition" and forwarded CGLI notes from his appointments with Vega. (Defs' Br., Ex. J). Those notes indicated that Dr. Thompson, on November 4, 2004, treated Vega for a lumbar thoracic sprain and, on September 16, 2005, completed a physical examination of Vega, finding him to be a "[h]ealthy male[.]" (Defs' Br., Ex. J).

In addition, Dr. Abenante, Vega's treating psychiatrist, submitted to CGLI a completed Disability Behavioral Health Questionnaire, signed on April 11, 2006. (Defs' Br., Ex. K). Dr. Abenante stated that Vega suffered from major depression, insomnia, and a stuttering problem. (Defs' Br., Ex. K at 3). Although noting that Vega did show signs of improvement in various areas, such as behavior, speech, judgment, insight, and concentration, Dr. Abenante diagnosed Vega with having obsessive compulsive disorder ("OCD"), social anxiety disorder, and depression. (Defs' Br., Ex. K at 3-4). Notably, Dr. Abernante checked the "Yes" box in reply to the question: "Can your patient currently perform his or her job duties in an alternative work

setting?" (Defs' Br., Ex. K at 5). The doctor, however, clarified that, although Vega "is willing to return to work at Exxon Mobil[,]" he "recommend[s Vega] stay on disability[.]" (Defs' Br., Ex. K at 5).

CGLI then submitted Vega's file to a Behavioral Health Specialist, Lance Gardner, a Licensed Professional Counselor ("LPC"), for review. (Defs' Br., Ex. L). In an undated memo, Mr. Gardner listed and summarized Vega's medical records for the period of January 4, 2005 through February 28, 2006, during which Vega received treatment from Dr. Abenante eighteen times. (Defs' Br., Ex. L). Mr. Gardner noted that Vega, at the time forty-three years old, was formerly employed as a truck driver and was diagnosed with depression. (Defs' Br., Ex. L). He found that Dr. Abenante's diagnosis of depression "is supported by reports of [symptoms] such as sleep disturbance, anxiety, thought perserveration [sic], and distractibility." (Defs' Br., Ex. L at 2). However, Mr. Gardner determined that "OCD and panic disorder are not supported." (Defs' Br., Ex. L at 2). In addition, Mr. Gardner noted:

> [1]. Medications have been somewhat static which is typically indicative of their achieving the desired effect of [symptom] alleviation. Most importantly[,] however[,] is the issue of no medical records or COD from [an]y provider in the period spanning 5/28/04 to 1/4/05.
> [2]. There is no clinical assessment or direct observation offered which would help to quantify the severity and frequency of any of the reported [symptoms]. It is[,] therefore[,] impossible to appreciate their impact on [Vega]'s functionality.
> [3]. R[eturn ]T[o ]W[ork] is not currently a goal of [treatment].

(Defs' Br., Ex. L at 3). From those findings, Mr. Gardner concluded that the information provided did not support a conclusion that Vega's disability prevented him from performing any work. (Defs' Br., Ex. L at 3).

As a result, on May 31, 2006, CGLI sent Vega a letter informing him that he was no

longer eligible for long-term disability benefits. (Defs' Br., Ex. M). In that letter, CGLI stated that its Behavior Care Specialist and Nurse Case Manager both reviewed Vega's medical records and determined that those records lacked "supporting evidence of [Vega's] inability to perform any work activities." (Defs' Br., Ex. M at 3). The letter further stated that, because "[t]here was no indication of ongoing restrictions on [Vega's] activities that would prevent you from working[,]" CGLI was "unable to submit [Vega's] claim for Transferable Skills Analysis." (Defs' Br., Ex. M at 3). Ultimately, CGLI noted that it did not "disput[e] that [Vega] ha[s] medical conditions, but [that] the medical evidence received does not support that [Vega is] unable to perform the duties of any occupation as a result of [his] conditions." (Defs' Br., Ex. M at 3).

Disagreeing with that conclusion, Vega appealed the denial of his benefits to CGLI on September 15, 2006. (Defs' Br., Ex. N). In conjunction with that appeal, Vega submitted a Medical Opinion Form, regarding the "ABILITY TO DO WORK-RELATED ACTIVITIES (MENTAL)[,]" which had been completed by Dr. Abenante on September 5, 2006. (Defs' Br., EX. O at 5-6). In that Form, Dr. Abenante stated that Vega "is unable to perform gainful work[.]" (Defs' Br., Ex. O at 6). Vega also submitted Dr. Abenante's treating notes from appointments that occurred between January 4, 2005 and August 31, 2006. (Defs' Br., Ex. O at 7-13).

Upon receipt of those records, CGLI drafted a "Staffing File Review" memo dated October 26, 2006 which stated that a medical doctor would review Vega's file. (Defs' Br., Ex. P). In a handwritten note on that memo, on November 1, 2006, R. Unsell, M.D., wrote that the clinical information provided did not support a finding that Vega could not perform "work

secondary to a psychiatric functional impairment[.]" (Defs' Br., Ex. P). Accordingly, on November 1, 2006, CGLI sent Vega another letter stating that it "uph[e]ld the prior decision" denying the claim. (Defs' Br., Ex. Q). CGLI informed Vega that it submitted Vega's medical evidence to a Physician Board Certified in Psychiatry, Dr. Unsell, who concluded that "the clinical information on file does not support restrictions or limitations of your inability to work secondary to a psychiatric functional impairment." (Defs' Br., Ex. Q at 3).

Nevertheless, on November 3, 2006, Vega submitted to CGLI a copy of a Notice of a Fully Favorable Decision from the Social Security Administration, (Defs' Br., Ex. P & S), and, on November 16, 2006, Vega appealed the denial of benefits to the Plan Administrator, (Defs' Br., Ex. T). After conducting an independent review of Vega's file and medical records, the Administrator also determined that Vega was ineligible for long-term disability benefits. (Defs' Br., Ex. U & V). On January 19, 2007, the Administrator sent Vega a letter notifying that its independent reviewers "determined the medical documentation does not support a conclusion that [he is] unable to perform any and all jobs as provided under the [Disability Plan]." (Defs' Br., Ex. V at 3). The Administrator concluded that Vega's "available medical information does not indicate that [he] ha[s] a physical or mental health impairment that renders [him] unable to perform the duties of any occupation." (Defs' Br., Ex. V at 3). Therefore, the Administrator denied Vega's appeal.

On December 6, 2006, Vega filed the present action, seeking to recover long-term disability benefits.[2] Defendants now move for summary judgment, claiming that there is no

---

[2] Because the improper parties were initially named as defendants, on January 29, 2007, the parties entered a stipulation agreement, substituting the proper defendants.

dispute of material fact that their denial of benefits to Vega was not arbitrary and capricious. In response, Vega opposes that motion and cross-moves for summary judgment, arguing that Defendants' denial was arbitrary and capricious, as a matter of law.

## II.     DISCUSSION

### A.     Standards of Review

#### 1.     Standard of Review under Federal Rule of Civil Procedure 56(c)

A court shall grant summary judgment under Federal Rule of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, *supra*, 477 U.S. at 249. If

the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

### 2. Standard of Review in a Denial of Benefits Claim under ERISA

Where a Disability Plan grants discretionary authority to its administrator to determine eligibility for benefits, as it does here, a court "may reverse [a] denial of benefits only if the administrator's decision was 'arbitrary and capricious.'" *O'Sullivan v. Metropolitan Life Ins. Co.*, 114 F. Supp. 2d 303, 307 (D.N.J. 2000) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am.*, 222 F.3d 123, 128-29 (3d Cir. 2000)). The arbitrary and capricious standard, like the "abuse of discretion" standard, considers "whether the administrator's decision was based on the interpretation of the plan or on factual determinations." *Ibid.* Accordingly, a "court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence[,] or erroneous as a matter of law[,]'" but it may not substitute its own judgment for that of the administrator. *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (quoting *Adamao v. Anchor Hocking Corp.*, 720 F. Supp. 491, 500 (W.D. Pa. 1989)).

Moreover, the Third Circuit applies a "sliding scale approach" to the arbitrary and capricious standard. *Post v. Hartford Ins. Co.*, 501 F.3d 154, 161 (3d Cir. 2007). "This approach grants the administrator deference in accordance with the level of conflict[:]" if the level of conflict is high, then a court grants less deference to the administrator; if the level of conflict is low, then a court "applies something similar to traditional arbitrary and capricious

review[.]" *Ibid.* Recently, the Third Circuit has explained the district court's analysis under this approach as follows:

> [C]ourts first consider the evidence that the administrator acted from an improper motive and heighten their level of scrutiny appropriately. Second, they review the merits of the decision and the evidence of impropriety together to determine whether the administrator properly exercised the discretion accorded it. If so, its decision stands; if not, the court steps into the shoes of the administrator and rules on the merits itself.

*Id.* at 161-62. Under the first step of that analysis, a court must consider structural factors—meaning, financial incentives created by a plan's organization[3]—as well as procedural factors—meaning, the manner with which the administrator treated the particular claimant.[4] *Id.* at 162. Notwithstanding the enunciation of these factors, the Third Circuit has advised that "the sliding scale reduces to making a common-sense decision based on the evidence whether the administrator appropriately exercised its discretion[; t]his theme, rather than getting bogged down in trying to find the perfect point on the sliding scale, should be district courts' touchstone." *Ibid.*

### B. Analysis

As a threshold matter, the Court must first determine what level of scrutiny is appropriate in this instance under the "sliding scale" approach to the arbitrary and capricious standard. Although Vega argues for a "heightened" review under *Pinto v. Reliance Standard Life Insurance*, 214 F.3d 377 (3d Cir. 2000), *Pinto* is inapplicable to this case. *Pinto* requires a more

---

[3] A court should focus on "whether the administrator's incentives make treating it as an unbiased fiduciary counterintuitive." *Post*, *supra*, 501 F.3d at 163.

[4] A court should focus on "whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality." *Id.* at 165.

searching review of a plan administrator's denial only where the disability plan is self-administered, thereby creating an inherent financial interest in the determination of a benefits claim. *Pinto*, *supra*, 214 F.3d at 387 (holding that "heightened scrutiny is required when an insurance company is both plan administrator and funder"). Here, the Plan is not self-administered, but, rather, is administered through a separate entity, CGLI, which does not receive financial incentives for its determinations on individual claims. Thus, *Pinto*'s concerns of conflicts of interest arising from a plan's structure do not arise in this case.

Moreover, Vega has not argued that a more searching review is required under *Post*'s rubric, and the Court finds that there is nothing in the record indicating that Defendants engaged in any structural or procedural bias. *Post*, *supra*, 501 F.3d at 162. The only possible procedural bias that may be gleaned from the record is the existence of typographical errors—such as addressing the letter to a "Mr. Adis" rather than "Mr. Vega"—in the November 1, 2006 letter to Vega. However, considering the full content of that letter, it appears that CGLI did indeed consider all of the medical evidence submitted in Vega's file and that the letter's errors "reasonably can be chalked up to low-level carelessness." *Id.* at 165. For those reasons and based on a "common-sense" review of the record, the Court holds that the "traditional" arbitrary and capricious standard is applicable to this case.[5] *Id.* at 161.

In light of that standard, the Court now turns to the substantive question of whether

---

[5] Although the fact that a claimant for benefits is a *former* employee may give rise to an indication of bias, Vega, here, has not alleged that his status as a former employee impacted Defendants' determination in any way. *See Post*, *supra*, 501 F.3d at 164 ("We have also noted that when the claimant is a former employee, any dissatisfaction with the claims handling process is less likely to translate into a significant financial disincentive for the employer."). Thus, the Court refrains from hypothesizing as to whether Vega's employment status affected Defendants' financial incentives in reviewing Vega's claim for benefits.

Defendants' denial of Vega's claim for benefits is arbitrary and capricious. Defendants argue that the record clearly shows that they extensively reviewed and considered Vega's application for benefits and that their denial of benefits is based on the medical evidence provided. In his cross-motion, Vega submits that the record does not support Defendants' denial for the following reasons: (1) a medical doctor did not review his file; (2) Defendants did not submit Vega to an independent medical evaluation; (3) Defendants did not conduct a vocational analysis of Vega's capabilities; and (4) Defendants ignored the Social Security Administration's finding that Vega is disabled.

   The Court, reviewing the record supplied and having considered the arguments made at oral argument, finds that Defendants' denial of benefits is not arbitrary and capricious; indeed, the record shows that Defendants engaged in an in-depth review of Vega's medical records and appropriately applied the Disability Plan's BCT to conclude that Vega is not eligible for long-term disability benefits. First, Vega is incorrect is asserting that a medical doctor did not review his medical records. Indeed, at both the initial review stage and appellate stage, registered nurses did review his file, but only in conjunction with reviews conducted by a behavioral heath specialist licensed as a professional counselor and by a physician board certified in psychiatry, Dr. Unsell.

   Second, Defendants were not required to submit Vega to either an independent medical evaluation ("IME") or to conduct a vocational analysis. Under the terms of the Plan, CGLI *may* seek an IME and *may* conduct a vocational analysis, but only where the medical evidence submitted warrants such reviews. (Defs' Br., Ex. E at 26-27). Thus, these additional reviews are discretionary based on the evidence presented, and, here, there is nothing indicating that CGLI

abused that discretion by declining to submit Vega to an IME or vocational analysis.

Finally, Defendants' refusal to consider Vega's favorable result before the Social Security Administration ("the Administration") is not sufficient for the Court to conclude that Defendants' denial of benefits is arbitrary and capricious. Indeed, "a disagreement [between a Social Security decision and a determination under the Plan] is relevant although not dispositive, particularly . . . when the administrator rejects the very diagnoses on which the Social Security benefits determination is based." *Post*, *supra*, 501 F.3d at 167 (footnote omitted). Defendants rejected Vega's claim that his depression rendered him unable to perform *any* job, and concluded that the Administration's finding of "disability" was not dispositive because the Administration applies a different definition of "disability" than the Plan. In fact, Defendants are free to define "disability" different than the Administration as part of an employer's "large leeway to design disability and other welfare plans as they see fit." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). Although Defendants could have considered the Social Security opinion in conjunction with its review of Vega's medical evidence, its failure to do so does not render their decision arbitrary and capricious in light of the facts that Defendants considered all of the medical evidence provided in the record and that the Administration's result was reached via a different analysis of that record.

Considering Defendants' lack of conflict of interest, three-tiered review of Vega's claim, and clear consideration of Vega's medical records as provided, the Court holds that there is no dispute of material fact that Defendants' denial of Vega's claim for benefits was based on their interpretation of the Plan and on factual determinations relating to Vega's disability. Significantly, the Plan requires a showing that a claimant is unable to perform *any* job and the

record shows that Vega's treating physician found that Vega would be able to "perform his . . . job duties in an alternative work setting[.]"  (Defs' Br., Ex. E at 5).  Considering the Plan and the medical evidence reviewed by CGLI, the Court cannot say that Defendants' denial was "without reasons, unsupported by substantial evidence[,] or erroneous as a matter of law."  *Abnathya*, *supra*, 2 F.3d at 45.  Accordingly, the Court holds that Defendants' denial of Vega's claim for long-term disability benefits under the Plan is not arbitrary and capricious.

### III. CONCLUSION

For the reasons expressed above, the Court grants Defendants' motion for summary judgment and denies Vega's cross-motion for summary judgment.  An appropriate order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated:  January 23, 2008